May it please the Court, Walter Cannon on behalf of defendants below, appellant here, Patrick Dempsey and Mark Hutchinson, two Las Vegas Metropolitan Police officers. In your order of December 2011, you asked the parties to give you supplemental briefs as well as to be prepared to argue whether the Madoff's case applies here and controls here. It's our position it does, and requires at a minimum a reversal of Judge George's decision with regard to qualified immunity. Well, but it only deals with tasers, and in this case, there were tasers, but there were several other uses of force as well. There were – well, there were baton strikes and there were tasers utilized. And there was – and there were putting pressure on his back. Well, yes, but 43 seconds of pressure clearly distinguishes this case from the Drummond case that Judge George used. Well, that's not what I'm asking you. I'm just saying that this is not – Yes, there was. It's only a taser case in part, and then I have the same question I asked before, which is do we look at it in pieces or would you look at the whole? I think you look at the entire process, because you're trying to determine what a reasonable police officer would do given these circumstances. They're escalating circumstances, and as we know – That's a question that I have when you use the term escalating. At some point, he was handcuffed. Yes, he was. And my biggest concern is what happened after that, because once he's handcuffed, he has limited mobility and limited opportunity to pose a further danger. So what in – once he was handcuffed, how did he escalate things in your view of the record? If you remember from the record, and I'm sure you do, he was handcuffed after he had been tased three times. He was placed on the bed, face down, with his hands behind his back. Right. That's the point where it looks to me like he's subdued, period. What happens after that? The uncontroverted testimony, at least as I understand it at that point, is that he continues to kick – It's uncontroverted because he's dead, which has its own ramifications. I understand that as well. He continues to kick at Officer Denny. He attempts to bite Officer Hutchinson. Which can be avoided by just stepping away, since he's handcuffed. Well, his feet are still moving. He's tossing his head from side to side. Right. And he's handcuffed lying face down on a bed. So all they have to do is walk about two feet away from him and he's not biting or kicking. I think that's true to an extent. But remember as well that this man, I don't think there's any question, was under the influence of cocaine, flexeril, and another drug as well. And as this Court held in the Locktell case, people that are under the influence of drugs do indeed act unpredictably and irrationally. So while a person that's handcuffed might very well, a normal person, act rationally and sit there and let it happen, he didn't. It's not a matter of how he – whether he's rational. I have – my question is about physical incapacity. I don't – just speaking for myself, I have no difficulty with what happened up until the point he was handcuffed and placed face down on the bed because of all the things that you've said. But once he is basically incapacitated, I don't understand why there's continued use of – why a jury couldn't find that continued use of force after that point was excessive. Okay. He still could have gotten up, unless you take your head – the officers take – I'm sorry. Can you just tell me, just so I know what we're talking about, what was the excessive use of force after that? Was there one more taser? There was one taser while he was on the bed, yes.  That was the end of it. And the other person sitting on top of him. And the officer, Hutchinson, put his knee over the top of the gentleman's body to keep him from coming up. It's light pressure. It lasted no more than 43 seconds. And the other officer was on his lower body. The other officer was holding his – the lower torso at his buttocks in the lower torso area. On top of him. To keep him from getting up. No, he wasn't actually on top of him. That's what the evidence was. He was holding him down at that point. Where was that? I thought the evidence was that he was physically on him. I think there's a dispute as that. If you want to take that. All right. We'll let it be a dispute. He was sitting on his lower torso. Right. Holding him. If we take the facts most favorable to the plaintiff, yes. And he was holding him there, or attempting to hold him there, but still getting kicked. One was sitting on his lower torso, and one had a knee on his back. I'm sorry? One was sitting on his lower torso, and one had a knee on his back. One had his knee in – around his shoulder blade area, yes. And at that point, the question – he was left there. The other officers arrived at the scene. They took control of him. And I'm sure you know that at that point he was non-responsive. They called medical, and they came out. We believe, based on the Graham analysis, certainly there was a serious crime. He kicked the officer in the face. That's what started the entire thing. There was no crime, I thought. Well, initially there wasn't a crime. When they came to the house, there was a property crime at most. Once they went into the bedroom, Officer Denny was the first person in. He had his taser out initially. He holstered it in the attempt to de-escalate the situation. And at that point, he tried to communicate with Mr. Tucker. But the man was obviously psychotic. I don't see how it could be a crime. I mean, he was – he had a serious mental health problem at the moment. And he had a serious mental health problem at the time. And I think the evidence is not a mental health problem, but rather a drug issue. All right. A drug issue. Whatever it is. Isn't that making him any less dangerous to the officer, simply because he's psychotic, delusional, and tearing his apartment apart? No, it doesn't. Indeed, it doesn't. No, it's just – I'm just talking about your representation that there was a crime. But leaving that aside, isn't there also some – well, first of all, there's some indication in our case law that it does make a difference, whether he was psych – whether he had a – was there for committing a crime or there because he was out of control, either because of drugs or mental health problems. Is there not? I think I understand. On the grain factors, because one of the grain factors is the seriousness of the crime. Right. I think what you're asking is this. When they – and I think it breaks down. When they got to the house, the worst-case scenario at that point is you had Mr. Hosper in fear and that their – the house had been destroyed. You have property crimes. When the officers got to the bedroom and Mr. Tucker kicked Officer Denny in the head, at that point we have a different situation. And do you look at the application of the taser at that point as far as the crime is concerned? In Brooks, for example, when Mrs. Brooks was tased, she was in the car and wouldn't get out of the car. That was the crime that the Court, as I understand it, discussed in Brooks. Here, the crime is a kick to the head of Officer Denny and an immediate jumping on Officer Denny by Mr. Tucker. But the – I guess it's the Brooks analogy that I'm thinking of when I ask you about whether the force could be considered excessive after he was subdued, because that was one of the factors in Brooks, was that she wasn't in a position to really harm anybody at that point. And here you have the weight placed on his back and so forth. Right. After he's been handcuffed and put face down. I think I understand what you're saying as far as that. But I think the answer that I would give to that particular question is, frankly, simply because someone is handcuffed behind their back and laying on the bed, I don't know that that equates to subdued. The testimony in the case, admittedly from the officers who were the only two there besides Mr. Tucker, was that he continued to thrash. He actually kicked the officers and attempted to bite one of them. I don't know if that's the case. Yeah, I guess my issue is just that it seems to me that a reasonable jury could conclude that in view of the possibility of just stepping back to avoid further injury, whether that was excessive at that point. I see the point you're making. And at that time, then, I would say, but under this Court's decision in Madoff's case and Brian, qualified immunity for the officers would clearly apply. We know in 2004, 2005, and 2006, there was no clearly established law with regard to the use of tasers. Yeah, but there was with regard to sitting on people and we can't do that. Well, is there a duty to retreat? At this point, it seems to me we've established probable cause to believe that a felonious assault on the officer has occurred. Whether this guy's psychotic or not, he's still actively resisting. And isn't the officer entitled to take him into physical custody at that point? Is there any requirement that he back off in order to avoid being kicked again? Not that I know of, no. I don't know any case that says that. I'm unaware of any such case. Why was the expert testimony here exactly with regard to the connection between his drug-induced state and the force used? In other words, is there evidence in the record that using this kind of force on a person who has cocaine and other drugs in his body may have other physical consequences than otherwise? Is there such evidence in the record? Is there evidence? I'm sorry. And are the police ---- in other words, is the ---- I gather no one quite knows what the death, why the death occurred, and obviously that would be an issue if there were a trial as to causation, but I think the medical examiner found something like it was due to a combination of the restraints and the drugs. Is that essentially accurate? Well, the medical examiner said that the significant ---- there was a significant factors were the drugs and that it happened in conjunction with a physical restraint. Yes. That was the finding of the medical examiner. And ---- but there was ---- is there any evidence in the record as to just in general whether people who are under drugs to this degree, whether certain uses of force are likely to affect them differently than other people? I believe that if you look at our record, 185 to 190, we talk Mr. John Please, who's a professor at Indiana University, actually addressed that point, yes. And said? Basically, he said that people under this kind of drug, with the high levels that this gentleman had in his body, he believed that the drugs alone would have caused his death. That's not really what I asked you. Okay. Go ahead. I see that I have 2 minutes and 36 seconds left. I'd like to reserve that, if I could, unless anyone has a further question. You certainly may. Thank you very much. May it please the Court, counsel, my name is E. Brent Bryson. Assisting me today is Mr. Potter Cowley J. Potter. It's interesting that at oral argument, counsel argues Drummond, which is where the lower court's main focus was in analyzing this court. However, their briefs are completely void of any reference to Drummond or analysis in Drummond. Well, I thought their argument was that the case is closer to Gregory v. the County of Maui. Well, that may be, and the lower court did rely somewhat on that, but differentiated this case because in Gregory, that particular individual was armed. Mr. Tucker was not armed at the time that this happened. Well, it doesn't the fact that he wasn't armed makes him no less dangerous if he's psychotic as a result of a reaction to a drug overdose. Well, when we're talking about dangerousness and safety issues for the officers, first of all, when the officers arrived, the roommate comes out and says he hadn't been threatened, he hadn't been hit, he hadn't been the subject of violence. These two officers go into the residence with the mindset that they're going to be in a fight. Obviously, the roommate was very – was frightened. Well, the roommate may have been frightened. And that the place was a mess. Well, that's true. But the officers found, as of the time they entered, no crime had been committed and that they were not – Yes, but they were dealing with somebody who was sufficiently disturbed, whether by drugs or otherwise, that he was pulling doors off hinges and smashing windows and throwing TVs. I understand, which is why this Court also in Diorly and the lower court also talked about, when you realize that you're dealing with someone that is emotionally or mentally disturbed, that you must take that fact into consideration. At the time these officers entered the residence, Mr. Tucker was inside his home. It's the place where, all the way back from the beginning of the framers of the Constitution, it said we have the greatest expectation of privacy. But that has to do with the entry into the place. And the roommate had invited the police in. So I don't understand why his – it would be any different analysis if he were in somebody else's house lying around. Well, the difference is the roommate invited them into the common area. The roommate had no right to allow them into the bedroom area. But assuming – So is that relevant to your excessive force claim? Well, only to the extent that when they saw this individual, they saw him, that he was laying on his bed. At that point, every – the testimony concedes, no crime had been committed. Pleading and saying very strange things. Exactly. But – What, they should have just left him there and walked out? No, no. And what this Court said in Diorly is, under those types of circumstances, you should try to get in contact with people that are trained, such as crisis intervention officers could have come. They could have called medical. Well, just because there are other options that people could do, I don't – I guess I don't understand why that matters. The reason that it matters is, under the teachings of Diorly, they say you have – this is absolutely established – that you have to take that factor into consideration. These officers clearly didn't because they went hands-on with this individual who had made no aggressive movement towards them at the time. All right. How does that fit into your excessive force claim? Pardon? How does that fit into excessive force claim? Well, because that's part of the Graham analysis when you go through a – which is what the judge did when he went through the Fourth Amendment. He correctly went through a Fourth Amendment analysis. I guess what I'm concerned about is that you're – in terms of the initial use of force, it seems like you're ignoring the obvious signs that this person had recently been quite aggressive and violent in the home. Aggressive and violent by destroying property, not by hurting an individual, nor – he threatened an individual. But let's focus on the time period. I'm talking about a totality of the events, because the lower court really focused on the same time period as Your Honor is talking about. Let's assume for purposes – which is not the correct standard, because the assumptions and the inferences and the factual allegations are supposed to be considered in our language. But there's no dispute that the place had been trashed and that the roommate said he trashed it. That's true. Okay. So that's undisputed for our purposes. Absolutely. So let's get to the point that prior to touching Mr. Tucker, he had made no aggressive movements or no threats. But let's say that – let's concede that the officers have a right to touch him to see his hands. It seems to me, Mr. Bryson, that you're ignoring the community caretaking function of the police. Wasn't he bleeding at the time that they entered the apartment as a result of all the glass that he'd broken inside before they got there? And that's why they're supposed to call medical. Police are there to carry out the law enforcement. They're not trained in medical. Paramedics are not going to go in and tell this guy is under control, because now this guy's going to be a danger to the paramedics if the police don't have him in custody. I understand, Your Honor. But what I'm saying is there was time to assess what was going on. Fifteen to twenty seconds in dealing with an individual under Diorly, I don't believe satisfies that requirement. But Diorly doesn't say that the officers have to back off and call somebody from the mental institution with a big net. I mean, the problem is you've got a guy here who has now hurt himself as a result of whatever it is that he's done from whatever caused him to do it. And I'm – and your – I think your position is that at that point the officers are powerless to do anything. No, that's not my position. My position is when we look at a totality of the circumstances. All right. First of all, a totality of the circumstances is a phrase that's somewhat overused. Not by you, but anyway. Leaving that aside, I still want to see the link of this entry problem to the excessive force. It's – is it that the only crime that occurred in the way that Judge Chalman was describing earlier wouldn't have occurred if they hadn't done this, and therefore, that includes the whole impact of the grain factors? Is that what you're saying? That's what I'm saying, because if they had not touched this individual at that point, and there were no safety concerns at that point for individual safety, that's what escalated the situation. So you have a species of this self-generated violence problem. That's correct. But let's assume that once the touch is made, that the officers act reasonably up until the point the individual is cuffed behind his back. Now, at that point, the – the officer, Hutchinson, admits that at the time the Drummond case, which happened a year before this incident, he admits that he was aware of the phenomenon known as positional or compressive asphyxiation. At that time, so he understands, at the time the cuffs are put on and Mr. – Mr. Tucker who has a broken arm, by the way, so you're talking about essentially a one-armed man with two legs, handcuffed behind his back, a knee in his back, and another officer sitting on his buttocks and lower back complaining, Mr. Tucker complaining, that he can't breathe. And on top of that, we're getting to the point where he can't breathe. I mean, that does seem to be the difference between this case and Drummond, which is that at least the evidence and all we've got, because Mr. Drummond is not here to tell us, not Mr. Tucker, is that they immediately got off, unlike in Drummond, where the problem seemed to be that after he's – or at least a problem seemed to be that after he said he couldn't breathe, they didn't do anything. Well, I thought I heard Mr. Cannon state that it was 43 seconds. I thought he said it was a total of 43 seconds. Well, whatever amount of pressure is, we know that that's a dangerous situation. That's what Drummond says. Drummond doesn't give us a time limit. But the only thing I'm saying is that the can't breathe thing doesn't seem to have anything to do with it, because it appears that as soon as he said that, they got off. And additionally at that time, he is now tased. Now, when he's tased, it's against departmental policy. Which doesn't rise to a level of a constitutional violation, I understand, under Torres. But what it does, the reason that's important is it goes to an analysis of the reasonableness of the officer's action. There was a policy that – and he said that he was aware of that policy, too, at the time Mr. Tucker was cuffed – that absent emergency circumstances, an individual that's handcuffed shouldn't be tased. So he says he's aware that you – of the positional asphyxiation. Then he says he's aware of the policy of the law enforcement agency not to use a taser after they're tased – I mean, after they've been handcuffed. So he ignores both policies. So under a totality at that point, clearly excessive force is being utilized. Well, wait. As to the positional asphyxiation, what's the policy? The policy is don't put your knee on somebody's back? Under Drummond, I submit that it was well-established law as of 2003 when you have – actually, the analysis would be this. Under Diorle, you should take into consideration the emotional and psychological behavior that's being displayed by the person you're encountering. Now we take it the next step to Drummond, where it says – Drummond says that when you have a handcuffed individual behind the back, every reasonable officer should know, once you're handcuffed, that you shouldn't put your knee in the back of an individual such that it interferes with the breathing. There's no time limit for that. But once they're – But what does the handcuffs and the knee have to do with each other? Well, it goes to the breathing function. When they first encountered Mr. Tucker, they said Mr. Tucker was laying on the bed and they could see that he was having difficulty breathing. So they already know he's having difficulty breathing. Then at the critical point that the lower court focused on – That's not the testimony. The testimony was that he was still resisting. So he clearly was not having difficulty breathing if he was able to be that ambulatory. No, the testimony, with all due respect, the testimony is when they first found him, he was laying on his back, that he was sweating, and he was breathing heavily is what the testimony established. But I thought we were talking about when he was – you keep jumping back and forth. I thought we were talking about the point at which the knee got put in the back, which is much later than that. Right. At the point that the knee gets put in the back, we have an individual that's handcuffed with his hands behind his back. But unlike in Drummond, in Drummond, the individual had stopped all movement. He was just laying face down on the pavement. And we said that the knee in the back was excessive. Here, he's still actively resisting, kicking, and so on, and thrashing around. And as soon as he says, I can't breathe, the officer gets up. That's different from Drummond, is it not? Well, it's different from the standpoint of the resistance. But what is similar – and the lower court found that given the discrepancies under Scott v. Henrich when he looks at the officer's testimony, which is you have to do because you can't accept the officer's testimony carte blanche in these situations because our guy's dead. And so in looking at the testimony, the judge found that there was discrepancies in what was going on in the event. And the fact that when Hutchison took his knee off, supposedly, right away, that that calls into question whether the knee actually ever had to be placed in the back in the first place. Well, that goes back to the question I was asking about whether or not he's actively resisting. Well, part of the testimony also by the experts are that the flailing, as far as any legs, could very well be in response to being tased, could also be in response to the batons that were so heavy that with each blow, you could see red marks. So finally, this individual gets cuffed. He then has a knee in his back by one officer. Another officer is sitting on his buttocks in lower back area, and he receives one more tase, which is against departmental policy. I submit to this Court under those that factual situation that under a totality of the circumstances analysis, there's at least enough for us to go to a jury that it's not appropriate for us to go forward to the jury, as the lower court found, on these issues. And Mattis really does not play much of a factor in this analysis because this strictly isn't a taser case. From the beginning, when we filed the complaint, we made references to beating and tasing, and that's EOR0020, using unreasonable and unjustified force, EOR0021, failure to train in the use of deadly and non-deadly force, and left the decedent in a position where he could not adequately breathe, EOR0023. Counsel, you have used up your time, and I think we understand your position. Thank you. Thank you very much. Mr. Cannon, you have some rebuttal time remaining. Well, it's down to 229, if counting. Let me very quickly address some of the salient points that counsel raised. He said twice it was against departmental policy. Look at EOR00700, and you're going to find it's department policy provided that you couldn't tase a handcuffed person if he was resisting or refusing to get into a police car, to a booking area, or to jail. It did not blanketly prohibit. That's what the policy says. Secondly, counsel alleges in his complaint filed in October and his amended complaint filed in October of 2005, amended complaint in February of 2006, that the very policy he now tells you applied didn't even come into effect until after Mr. Tucker's incident. That's in his complaint. Now the document shows that. That's what he says in his complaint. That's what he says, but what so? Well, what my position is, it doesn't matter because it doesn't apply anyway. Okay. But what so? But his position here is totally inconsistent with the two charging documents he filed in the case. Well, so what? I mean, we're in summary judgment, and the question is, was it in effect or wasn't in effect? Okay. The next point I've made. Was it or wasn't it in effect? It was not in effect at the time. Not in effect. Not in effect in the sense that he's using it. The policy came in in February of 2004. Okay. So it was in effect. The complaint was not in effect. The policy was in effect, but if you read the policy, it doesn't apply, I think is my point. The second thing counsel talks about, died of positional aphyxia. If you look at EOR 217 to 219, which he cites for that proposition, you won't find anything there that supports that conclusion. He also talks about, well, the officers, when they went in to the room at first, remember, as I think Justice Tallman pointed out, the man was bleeding from the mouth. He was bleeding from the nipple. He was on the bed. The officers couldn't just turn around and walk out the door. They had to make sure, once they went in there, as to what his condition was. And then he also talks about the officers, when one of the officers reached for Mr. Tucker in order to find out, after conversing with him, after attempting to de-escalate the situation, he got kicked in the head, and from there it went downhill. And why did he say he reached for him? I'm sorry? Why did he say he reached for him? To find out what was going on with him. To reach for him and get at least some type of control, hopefully some type of control on him. Those are two different things, to find out what was going on or to control him. Exactly. I don't understand. Those are two different things. One is investigatory and one is control. Which one was it? Well, I think he had an obligation to find out in the first instance what was going on when he walked through a house that was destroyed and a roommate that claimed that this man broke down. And so by touching him, he's going to find out what's going on. So he had to do that, and this officer is now walking into a room with a man that he's been told had destroyed the house, is bleeding from the mouth of the vehicle. So it was to get him under control. It wasn't to investigate him. So for officer's safety and safety of Mr. Tucker, he attempted to get some type of control. Okay. Thank you, counsel. I'm sorry. Thank you very much. I appreciate the arguments of both parties. The case is submitted.
judges: Graber, Berzon, Tallman